UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE CREAR

        Plaintiff,        CIVIL ACTION NO. 05-74191

    v.        HONORABLE PAUL D. BORMAN

SHIRLEE A. HARRY,        MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendant.
_____/

**REPORT AND RECOMMENDATION ON HABEAS PETITION**

This timely action for habeas corpus relief pursuant to 28 U.S.C. §2254 raises issues of prejudicial delay and ineffective assistance of counsel. An evidentiary hearing was conducted on the issue of ineffective assistance of counsel and briefs were submitted on the issue of prejudicial delay. For the reasons discussed in this Report, the court finds that counsel was not constitutionally ineffective and that application of the tolling provisions of Michigan's statute of limitations did not deny petitioner his constitutional rights.

*Introduction*

Petitioner, a former band teacher, was convicted by a jury in the Genesee County Circuit Court of three counts criminal sexual conduct, MCL §750.520b(1)(b) and §750.520c(1)(b). The complainant was a woman who had been petitioner's student in middle school. Deborah Young a/k/a Deborah Gwin met defendant while he was a teacher in the Flint public schools. The conduct was alleged to have occurred in 1983. In 1984, the complainant first raised the issue to her parents, school administrators, and the police. After the complaint was investigated, she

-1-

transferred schools, and at the request of complainant and her mother, the investigation was

terminated and no criminal charges were brought. Petitioner relocated to Florida in 1987. In

1995, the complainant became aware of a criminal sexual conduct prosecution against petitioner

in Florida. She became angry and decided to go to the police to repeat her charges. (Tr. Vol. III,

pp. 354-356) In 1995, the prosecutor filed charges, and petitioner was arrested in Florida. He

returned to Michigan, was convicted, and sentenced to life imprisonment.

After exhausting his state appellate rights, see *People v. Crear*, 242 Mich. App. 158

(2000) petitioner filed this action raising four issues[1]. These are:

> 1. *Ineffectiveness of Counsel*: Petitioner was deprived of effective
> assistance of trial counsel by counsel's failure to investigate,
> failure to prepare, and substandard performance at trial, and was
> deprived of effective assistance of appellate counsel by failure to
> raise trial counsel's ineffectiveness on appeal.
>
> 2. *Prejudicial Pretrial Delay*:  Petitioner was deprived of due
> process of law under the United States Constitution where there
> was excessive and prejudicial delay of twelve years in bringing
> charges against him.
>
> 3. *Denial of Constitutional Due Process by Application of
> Michigan Tolling Statute*:  Where petitioner lived openly in
> another state and was fully available to arrest and extradition to
> Michigan, petitioner was deprived of his right to travel under the
> United States Constitution where charges were not brought in
> Michigan within the applicable statute of limitations but that was

---

[1]Petitioner had an additional issue, number 4. *Denial of Constitutional Due Process Due
to Juror Bias*:  Petitioner was deprived of his right under the United States Constitution to a fair
and impartial jury where a post conviction hearing revealed that a juror had falsely stated during
voir dire that she was not acquainted with the prosecutor and had no knowledge of the case
despite the fact that she attended a college class within two weeks of trial where the trial
prosecutor was a guest speaker and discussed this upcoming trial. He withdrew that claim but
kept the numbering of the issues as originally stated. There is no issue 4 in this petition. (D/E
54, note 2)

excused by a provision which tolled the statute while petitioner resided outside the state.

5. *Denial of Constitutional Right to Confrontation*: Petitioner was deprived of his rights under the United States Constitution to confrontation and due process where the defense was deprived of an opportunity for an *in camera* review of a key witness' counseling records because the witness refused to sign a release for the records and the witness was nonetheless permitted to testify at trial.[2]

*Background*

Defendant is a former band teacher at Whittier Middle School and Central High School in Flint, Michigan. Complainant Deborah Young alleged that over two school years in 1982-83 and 1983-84 when she was in seventh and eighth grade, petitioner engaged in sexual conduct with her. She turned 13 in November, 1982. In 1995, when she saw on the news that petitioner had been arrested in Florida for similar conduct, she went to the Michigan authorities and repeated her allegations.[3] Petitioner returned to Michigan to face Young's allegations and raised the issue of the tolling period for the statute of limitations. At the district court level, counsel's motion to dismiss was granted. The prosecutor appealed and the decision was reversed. The case then proceeded to trial.

At trial, both sides called many witnesses. Mr. Rees Dean, an attorney for the Flint School System, testified that in 1984, Young made allegations of sexual misconduct against petitioner. Young's claims were investigated and discussed with petitioner, who denied them. (Tr. Vol. II, pp. 179-181) Bob Acres, the deputy principal at the middle school in 1984, testified

---

[2]This issue has also been withdrawn.

[3]Petitioner was acquitted on the Florida charges. Details of the Florida proceedings were not presented to the jury in this case. People v. Crear, 242 Mich. App. 158, 163 n.1 (2000).

that review of his notes indicated Young had been asked to write out a statement, and that he recalled that she only alleged petitioner had slapped her face. (Tr. Vol. II, p. 242) Witness John Kononchuk was a Flint police officer and in 1984 was the liaison officer to Central and Whittier schools. Officer Kononchuk testified the complaint was brought to police attention by Young's mother, who later told the police she wanted to drop the complaint. (Tr. Vol. III, pp. 305-307)

At trial, Young testified that in seventh and eighth grade she was quiet and insecure. She had no sexual experience. Petitioner was a strict teacher who demanded excellence. She was in awe of his musical ability and teaching skills. (Tr. Vol. III, p. 324) Her relationship with petitioner began in seventh grade. Mr. Crear began to talk to her about her problems in other classes and her home situation. She started to consider him a friend and confidant. (Tr. Vol. III, pp. 325-329) Then, following a band concert in February, 1983, after he had been asking her for several weeks if she had been looking at him, she was alone with him in the band room. He took her hand and placed it on his clothing over his penis. (Tr. Vol. III, pp. 330-331) She said nothing to her mother or father about the incident until much later. (Tr. Vol. III, p. 332) She testified that similar incidents, including Young touching petitioner's unclothed genitals and oral sex, happened between five and fifteen times during the rest of the school year in the file room across from the band room. (Tr. Vol. III, p. 341) She testified that one time when she got away from him, he made her play music in front of the other band members as an act of revenge. (Tr. Vol. III, pp. 344-349, 370) During the 1983-84 school year when she was in eighth grade, she became an aide for Mrs. Carolyn Crear–the wife of petitioner–who was also a teacher in the school. (Tr. Vol. III, p. 418) Mr. Crear was then teaching at Central High School, although he was at the middle school from time to time when Mrs. Crear, who was ill with cancer, could not

-4-

teach her class. Petitioner continued to have oral sex with Young in the "hot box"/ file room, and eventually the conduct progressed to digital penetration of her vagina. Young told a girlfriend about the sexual contact with petitioner but told no one else until March, 1984, when she reported the conduct to the principal. The report came about after Mr. Crear slapped her face; he heard a comment she made which had a sexual connotation. (Tr. Vol. III, p. 376) Contrary to the testimony of some witnesses, she denied telling anyone that the sexual allegations were false. (Tr. Vol. III, p. 399) The day after her initial report, she was called to the school office to write out a statement and then went to a meeting with the school authorities, her parents, and a police officer. (Tr. Vol. III, p. 380) She never saw Mr. Crear again at school after making the complaint. No charges were brought against petitioner. Young transferred to another school. Her mother decided not to pursue the matter criminally.

Some years later, after Young was no longer a student, she returned to Whittier and stopped by the band room to visit petitioner. (Tr. Vol. III, pp. 427-428) Young testified that when she was working at Baker College in 1995, she saw reports of Mr. Crear being arrested in Florida on a charge of sexual misconduct and became angry and decided to go to the police to repeat the charges. (Tr. Vol. III, pp. 354-356)

At the time of the trial, Young was receiving counseling from Bruce Ford. Ford testified that Young told him of other sexually abusive contacts, specifically that a prosecutor investigating this case had also sexually abused her and may have touched her in a sexual manner. (Tr. Vol. V, pp. 768-769) This conduct was denied by assistant prosecutor Charles Abraham, who also testified that he was instructed not to have any further dealings with the complainant. (Tr. Vol. VI, pp. 788-791)

Lynda Duffy testified that she was a student with Young in 1982-1983 and that Mr. Crear and his wife Carolyn were both band teachers there. She stated that a file room across the hall from the band classroom was referred to in slang terms as the "hot box." (Tr. Vol. III, p. 277)

Other women from both Michigan and Florida testified as Rule 404b similar acts witnesses to petitioner's conduct. Each witness had prior conversations with the other witnesses and had shared their stories. Some were pursuing civil actions for money damages against petitioner. One witness was Ms. Kerr, a sitting elected prosecutor and former assistant prosecutor in Genesee County, alleged that she had victimized by petitioner. Ms. Kerr had been a student of petitioner's in the 1970s, contemporaneously with Elizabeth Crear (petitioner's second wife). Ms. Kerr also had contact with witnesses from Florida who were pursuing a civil suit against Mr. Crear following his acquittal on charges there. Ms. Kerr stated that she went to Whittier in 1976-1977, later graduated from college and law school, and was at the time of trial the elected prosecutor of Charlevoix County, Michigan. (Tr. Vol. IV, pp. 459-461) Ms. Kerr claimed a sexual relationship with petitioner during her eighth grade year. (Tr. Vol. IV, pp. 469-470) She did not report these acts to her parents or school officials at that time. (Tr. Vol. IV, p. 485) She continued her relationship with petitioner, according to her testimony, during her high school and college years. He was the center of her life. (Tr. Vol. IV, p. 486) They had numerous acts of oral and vaginal sex. (Tr. Vol. IV, pp. 495-499) She later became mad, or at least upset, at him after he changed his phone number to an unlisted one and she was unable to contact him. (Tr. Vol. IV, pp. 559-561) While shopping at a mall in 1987, she ran into Linda Craig, a woman she had known in school. After her conversation with Linda Craig, she decided to go to school officials in Flint and make a complaint about petitioner. (Tr. Vol. IV, p. 527)

She also made an anonymous phone call to the Miami school system about Mr. Crear and had thought about getting such revenge when she was 18 years old. (Tr. Vol. IV, p. 530) Ms. Kerr also admitted that she had contacted many of the other witnesses. (E.g. Posner FL Dep. Tr. 213, FL trial Tr. 114-115)

Petitioner also testified at the trial. He was born in 1950. He stated that he started teaching in Flint in 1973 and came to Whittier Middle School in 1976. (Tr. Vol. IX, p. 1457) He encouraged parents to come to school and watch band practices and parents were there nearly every day.[4] He conducted band in a professional atmosphere, though sometimes he would yell at students to get their attention. (Tr. Vol. IX, pp. 1464-1469) Band members were required to play their parts alone in front of other band members. (Tr. Vol. IX, p. 1480) During 1983, he was transferred to Central High School but part of his job required him to return to Whittier and later the next year he went back frequently to assist his wife Carolyn who was a teacher there and was ill. She died shortly thereafter, in 1985. (Tr. Vol. IX, p. 1484) He stated that, when Deborah Young made the allegations against him, he was off work, at the hospital with his dying wife. (Tr. Vol. IX, pp. 1487-88) He said that Young was not a talented music student, was often uncomfortable playing in front of the others, and rarely socialized with other students. Id. He denied any sexual acts with Young, denied slapping her in the lunch room as she alleged, and denied taking her into the file room for any sexual acts. (Tr. Vol. IX, pp. 1498-1516) He admitted that the accusations were part of the reason he moved to Florida. He denied all the

---

[4] This was confirmed by others. According to parents of band members who testified, there were often 75 to 100 persons in the area at practices and performances. (Tr. Vol. VI, pp. 921-946) Nothing about petitioner's teaching style or interaction with students was cause for concern. (Tr. Vol. VI, pp. 929, 943-949)

sexual allegations that the Florida women had brought against him but admitted sexual intercourse with Kerr in 1986 after she graduated from college and before he married his second wife.  (Tr. Vol. IX, pp. 1663-1664)

Following the death of Carolyn Crear, petitioner became the sole parent of his young daughter Chaundra.  Chaundra testified she told her father after her mother died that she wanted to move away.  She also suggested that he start dating Liz Crawford, who occasionally had taken care of her.  In 1987, he married Ms. Crawford.  She also testified at trial.  Ms. Crawford had been petitioner's student in ninth grade some ten years earlier.  She was 26, a college graduate, and a teacher when she married petitioner in 1988.  (Tr. Vol. VIII, pp.1390-1393)  They had moved to Florida because she had been laid off but she knew teachers were being hired in Florida and petitioner learned of an opening there through a friend.  (Tr. Vol. VIII, pp. 1392-1393)  She denied any sexual activity with petitioner while she was in middle school or high school, specifically denied seeing Young in the file room with petitioner as Young alleged, and denied ever engaging in an act of oral sex with petitioner in a car as Kerr had alleged.  (Tr. Vol. VIII, pp. 1395-96)  She stated that Kerr was "stalking" her and that Kerr was jealous and in competition with her.  (Tr. Vol. IX, p. 1451)

The jury deliberated on November 17 and 18, 1997.  At 5:09 pm, they sent a note saying they were deadlocked.  The court gave an *Allen* charge and at 6:18 pm, the jury returned a verdict of guilty on all counts. (Tr. Vol. XII, pp. 1826-1831)  Petitioner was sentenced to life imprisonment.

*Analysis*

Petitioner's appeal to this court is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under the AEDPA, a writ of habeas corpus will not be granted unless the state adjudication on the merits resulted in a decision that either (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 404-5 (2000). However, if the state court did not rule on an issue, the federal court's review is *de novo*. Morales v. Mitchell, 507 F.3d 916, 929 (6th Cir.2007). In addition, the state courts' factual findings are presumed correct unless proven to the contrary by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Lewis v. Tennessee, 2008 WL 698935 (6th Cir.2008).

A state court's determination of a habeas petitioner's claim is "contrary to" clearly established federal law if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) the state court confronts facts that are materially indistinguishable from relevant Supreme Court precedent and arrives at a different result. Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state-court decision is an "unreasonable application" of clearly established law if it (1) correctly identifies the legal rule from a Supreme Court case but unreasonably applies that rule to the facts of the particular case, or (2) either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. Id. at 407, 120 S.Ct. 1495.

*Ineffective Assistance of Counsel*

Petitioner alleges that his trial counsel was ineffective and that appellate counsel was ineffective for failure to raise that claim on appeal. The argument made by petitioner's habeas counsel is that trial counsel was ineffective because she failed to present certain evidence which was available. To succeed on a claim of ineffective assistance of counsel, petitioner must show (1) that the performance of his counsel fell "below an objective standard of reasonableness" and (2) that he suffered prejudice as a result. Strickland v. Washington, 466 U.S. 668, 688, 695-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The prejudice inquiry requires petitioner to show that there is a "reasonable probability" that, but for trial counsel's deficiency, the trial would have come out differently. Id. at 694, 104 S.Ct. 2052. The Michigan Court of Appeals did not address the question of ineffective assistance of counsel because it was not raised; consequently the issue of trial counsel's ineffectiveness is procedurally defaulted. However, petitioner alleges that his appellate counsel was the cause for the failure to raise his claim about trial counsel in his appeal of right and thus the court may review the claim. Coleman v. Thompson, 501 U.S. 722, 750 (1991). If trial counsel performed adequately, then the court's inquiry is at an end as by definition appellate counsel cannot be ineffective for failure to raise an issue that lacks merit. Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001). Thus, an evidentiary hearing was held before the magistrate judge at which petitioner's trial counsel Lynne Taft testified.[5] A transcript of that hearing (EHT) has been filed.

---

[5]Because petitioner's claim regarding trial counsel was not raised by appellate counsel and petitioner's request for an evidentiary hearing was denied by the state courts, the district judge granted his request for an evidentiary hearing. See, D/E 59

At the hearing, it was established that Ms. Taft is a seasoned criminal trial counsel and a former assistant Genessee County prosecutor.  She was admitted to the bar in 1987, has been a criminal defense attorney since 1991, and had approximately six years of defense experience when this case was tried.  She was appointed to represent petitioner after the preliminary exam.  Ms. Taft spent six months preparing for the case, called 19 witnesses, including character witnesses and a former student who was at the time of trial a Flint police officer who contradicted Young's claim of being slapped.  She and spoke to the lawyer who represented petitioner in the Florida case where he was acquitted.  She reviewed his notes and "went through every page that I was provided, depositions, and transcripts." She spent an entire summer of her time off, weekends, evenings, reading through thousands of pages of material.  (EHT 18, 51, 95) She met with petitioner on numerous occasions, discussed trial strategy with him, found him to be the smartest defendant she had ever represented, and reviewed his notes during the course of trial.  (EHT 95-96)  Ms. Taft received training through various seminars in the prosecution and defense of sexual abuse cases involving children.  Ms. Taft's strategy at trial was that the conduct complained of simply did not happen; she understood that the credibility of the complainant was critical.  (EHT 8-12)  Ms. Young's written statement to school administrators was no longer available and the police reports from 1983 were also missing.  (EHT 13) She had notes of the school administrators and used them to cross examine them.  (EHT 25)  Ms. Taft explained her reasons for not asking other witnesses what they heard in 1983 because she was aware of the fact the Ms. Young's allegations remained consistent.  Ms. Taft stated that by asking such questions she would have buttressed the credibility of the complainant.  (EHT 27) She also was concerned regarding close questioning of the school administrators because of a

"distinct flavor" in their testimony that seemed to indicate to Ms. Taft that they were covering up a flaw in their investigation. (EHT 28) It came to Ms. Taft's attention that the administrators' notes indicated that other students had alleged relationships and very similar conduct with Mr. Crear. (EHT 32-34) She left these matters out of her cross examination but some of these women testified as character witnesses for the defense. (EHT 33) She was also concerned about the jury making allowances for the passage of time in witnesses' recollections and identifying with the complainant who had been a young teenager at the time the conduct was alleged to have occurred. (EHT 29)

Petitioner's habeas counsel made several inquiries regarding Ms. Taft's failure to cross examine Ms. Young vigorously about her recantation and to ask other witnesses in detail about this matter. (EHT 50) Ms. Taft did call several witnesses to refute Ms. Young's claim about contact after the band concert. These witnesses testified that it couldn't have happened the way Young said it did because there were too many people around after the concert. (EHT 54) Ms. Young said that petitioner took her to the "hot box" where reeds were kept. Habeas counsel questioned Ms. Taft about not pursuing the details of what was kept in the band room–whether sheet music or reeds. Ms. Taft stated that she recalled that and made a decision not to pursue questions on that issue because it would not have made a difference in the jury's evaluation of Ms. Young's testimony. (EHT 57)

Habeas counsel also asked abut Ms. Young statement at a Florida deposition that she had no contact with her parents for several years. At trial, she testified that she had regular contact with her parents during high school. Habeas counsel asked why this contradiction was not pursued in cross. Ms. Taft indicated that although she did not have a strong recollection, how

much time Young spent with her parents in high school after she transferred schools and lived with her grandparents was likely not important with respect to the trial strategy. (EHT 60-61) The deposition indicates that Young ended up running away from home, becoming a ward of the state, being placed in foster care, and was tormented and under constant scrutiny. (Dep. 166-167; Petitioner's Ex. 16 at EH)

Habeas counsel questioned Taft regarding the successful trial strategy in Florida regarding the Rule 404(b) witnesses. One of the principal theories of defense there was that the witnesses had collaborated with each other and orchestrated their testimony. (EHT 62) In Florida, there were several plaintiffs and they were pursuing a civil action. Ms. Taft obtained that information prior to trial. (EHT 62) In Michigan, no civil lawsuits were filed. In addition, there was only one named complainant. Nevertheless, Ms. Taft produced evidence that would permit similar argument of collaboration in the instant case. But, however, the Rule 404B similar acts evidence introduced by the prosecution spanned three decades–the 1970s (Kur, St. Onge, Fowler), the 1980s (Young), and the 1990s (Thorpe, Carper).

After carefully considering the evidence and testimony, the magistrate judge finds that Ms. Taft was well prepared for trial. She did a full and fair investigation of the evidence and witnesses, and maintained contact with petitioner. Further, her conduct of the trial preparation and trial did not fall below any standard of objective reasonableness. She called many witnesses, offered strong and positive character evidence of petitioner, attacked weaknesses of the prosecution's case, avoided pitfalls of collateral issues, and comprehensively advocated for petitioner's acquittal. Petitioner states that she did not meet with him enough, but fails to articulate how that would have resulted in a different outcome. Petitioner advised Ms. Taft of

the testimony of many of the witnesses, suggested who should be called, and advised what they would say. Petitioner alleges problems with the trial strategy. However, Ms. Taft offered reasoned bases for conducting the trial as she did. She called not only petitioner but witnesses who supported his character and credibility, who offered evidence attacking Ms. Young's credibility as to the events surrounding the alleged incidents, and directly attacked the credibility of other prosecution witnesses. The court is not persuaded by petitioner's arguments that Ms. Taft should have tried to impeach Ms. Young's testimony about petitioner having slapped her and what items were kept in the storeroom where the sexual misconduct allegedly occurred. Ms. Taft's decision not to cross examine alleged Florida victim Amy Carper by using Ms. Carper's emails is not ineffective. The emails between Ms. Carper and petitioner were signed "Love, Amy" and discuss the suicide of another alleged victim in Florida "Gigi." These emails would not have benefitted petitioner's theory that he and Amy were just friends. Indeed, they would have been damaging in many ways and Ms. Taft's decision to forego their use was sound trial strategy.

As the Supreme Court stated in <u>Strickland v. Washington</u>, 466 U.S at 689, "judicial scrutiny of counsel's performance must be highly deferential. The distorting effects of hindsight should be eliminated and the conduct evaluated from the perspective of counsel at the time. The court must indulge a strong presumption that the conduct falls within the wide range of reasonable professional assistance. In addition, a petitioner must demonstrate not only that counsel's performance fell below an objective standard of reasonableness but also that a different result would have obtained "but for" the conduct. In this case, the prosecution's case was very strong and petitioner's counsel conducted a vigorous and zealous defense. Petitioner

has failed to prove either prong of the <u>Strickland</u> analysis.  The request for habeas relief on the grounds of ineffective assistance of counsel should be denied.

### *Statute of Limitations and Prejudicial Pretrial Delay*

Petitioner was charged 12 years after the alleged offense occurred, presumptively beyond the statute of limitations.  Generally, "criminal statutes of limitation are to be liberally interpreted in favor of repose."  <u>United States v. Marion</u>, 404 U.S. 307, 323 n. 14, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).  "Statutes of limitations normally begin to run when the crime is complete." <u>Pendergast v. United States</u>, 317 U.S. 412, 418, 63 S.Ct. 268, 87 L.Ed. 368 (1943).  "A crime is complete as soon as every element in the crime occurs."  <u>United States v. Payne</u>, 978 F.2d 1177, 1179 (10th Cir.1992) (quotation marks and citation omitted).  This crime was complete no later than 1984.  Thus, if the limitations period has passed, "there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced," <u>United States v. Marion</u>, <u>supra</u>, 404 U.S. at 322, 92 S.Ct. at 464.

### *Due Process and Speedy Trial*

Petitioner alleges that the twelve year delay in bringing charges deprived him of due process of law under the United States Constitution.  Although this issue raises serious concerns, there does not appear to be Supreme Court precedent consistent with the proposition and therefore, for the reasons discussed below, the court must disagree with petitioner.

The analysis begins with Michigan's statute of limitations.  The statute requires prosecution within six years of the offense for charges of criminal sexual conduct.  But, where the complaint is under the age of 18 at the time of the offense, the statute is six years or until the complainant's 21st birthday, whichever is later.  MCL 767.24.  In this case, the statute of

limitations under the extension for minor complainants would have expired a little more than eight years from the date of the alleged offense, that is, in November, 1990, when the complainant turned twenty-one. Petitioner was not charged until five years after that. Thus, the prosecution would ordinarily have been time barred.

However, the following clause in MCLA 7676.24(1) tolls the limitations period:

*"However, any period during which the party charged did not usually and publically reside within this state shall not be considered part of the time within which the respective indictments shall be found and filed."* Petitioner argues that application of this tolling provision to his circumstances violates the federal Constitution. The Michigan Court of Appeals definitively found that the tolling provision applied to him during the time he resided in Florida. It rejected petitioner's arguments on appeal.[6] This is an interpretation of a state law by a state court and would be generally one which is not subject to review by a federal court in habeas. Bradshaw v. Richey, 546 US. 74, 76 (2005). If that were petitioner's argument, no further discussion would be needed. But, here petitioner alleges that the application of the tolling provision implicated his federal constitutional rights. Petitioner first alleges that the above tolling provision deprived him of due process of law, essentially denying him the right to a speedy trial. Federal consideration

---

[6]In petitioner's appeal of right, the Michigan Court of Appeal (People v. Crear, 242 Mich. App. 158, 163-65 (2000)) relied on People v. McIntire, 232 Mich. App. 71 (1998). Although the appellate court recognized that the case was not binding precedent, because it had been reversed by the Michigan Supreme Court, it found the analysis persuasive nonetheless. 242 Mich. App. 158, 165 (2000). In McIntire, the Court of Appeals applied the rule that the Legislature is presumed to have intended the meaning it plainly expressed, People v. Gould, 225 Mich. App. 79 (1997). The Gould court concluded that the tolling provision applied, even though the defendant was living openly in South Carolina, it was easy for the authorities to locate him, and he did not leave the state to avoid prosecution. In petitioner's case, the Michigan Court of Appeals held the tolling provision applied while petitioner was a resident of Florida.

may be given to review of a determination as to whether the state's action violated petitioner's federal constitutional right to a speedy trial or due process. See <u>Flenoy v. Russell</u>, 902 F.2d 33, 1990 WL 61114, * 3 (6th Cir. May 8, 1990) (citing <u>Millard v. Lynaugh</u>, 810 F.2d 1403, 1406 (5th Cir. 1987)); see also <u>Wells v. Petsock</u>, 941 F.2d 253, 256 (3rd Cir. 1991). <u>Campbell v. Wolfenbarger</u>, 2008 WL 1837259, 11 (E.D. Mich.,2008).

Petitioner first raised this argument in state district court, where he prevailed. The court noted that a challenge to the statute of limitations has nothing to do with guilt or innocence, the strength of the case, or the on-going prosecution in Florida. The court found that by the literal terms of the statute the time would be tolled after 1987 and the prosecution could proceed. (Tr. 10/11/95, 3-4) However, the court, after noting that the statute of limitations in civil and criminal cases involve the same legal principles, also noted that Michigan cases interpreting virtually identical language come out exactly the opposite as the literal language. (Tr. 10/11/95, 5) The district court discussed <u>Frazier v. Castellani</u>, 130 Mich. App. 9 (1983), a paternity case which interpreted the following language regarding the statute of limitations for bringing a paternity action: "If the defendant is outside the state during the six year period, the time he is so absent shall not be included in the six-year period." The court rejected that strict language, applied the legislative intent, and stated: "We conclude and join the majority of other jurisdictions which hold that the tolling provision of a statute does not apply when the non-resident defendant is amenable to service of process and to the jurisdiction of the court."[7] The district court noted that such interpretation was consistent with the federal criminal tolling

_____

[7]However, subsequently, in <u>Caldwell v. Chapman</u>, 240 Mich. App. 124 (2000), the Court of Appeals of Michigan, without mentioning <u>Frazier</u>, held that a similar tolling provision did apply in an action for child support that accrued before a paternity suit.

-17-

provision which halts the running of the statute of limitations only where the defendant is a fugitive from justice.[8]  In this case, it should be noted that at the time petitioner left Michigan, he had not been charged.  He lived openly in Miami, Florida from 1987 forward as he had taken new employment there.  No criminal charges were pending at the time he moved to Florida and petitioner was not a "fugitive."  Petitioner maintained bank accounts in Michigan, traveled back to Michigan for visits, and was always available for extradition.  The district court ordered the warrant quashed and the charges dismissed.

The prosecutor appealed to the trial court which reversed.  This reversal was upheld by the Court of Appeals.  Petitioner presented his argument on the grounds that the delayed prosecution denied him both due process and a speedy trial. The court noted that despite not raising it below, a challenge to prearrest delay implicates constitutional due process rights. Crear, 242 Mich. App. at 166.  The court analyzed the prejudice to defendant, requiring that in order to prevail there must be actual and substantial prejudice to the defendant's right to a fair trial and an intent by the prosecution to gain a tactical advantage, citing People v. Adams, 232 Mich. App. 128 (1998).  Similar analysis is found in federal cases, e.g., United States v. Marion, 404 U.S. 307, 324 (1971); United States v. Lovasco, 431 U.S. 783 (1977).  This circuit has stated that pre-indictment investigative delay will not justify dismissal unless a defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage.  United States v. Brown, 959 F.2d 63, 66 (6th Cir. 1992).  However, as noted by petitioner, the United States Supreme Court has not adopted a requirement of intent by the government.  The Court has only required a showing of prejudice

---

[8]See 18 U.S.C. § 3290, United States v. Marshall, 856 F.2d 896 (7th Cir. 1988).

coupled with a case by case examination of the reason for delay. See, <u>United States v. Crouch</u>, 84 F.3d 1497, 1510 (5th Cir. 1996) (neither <u>Marion</u> nor <u>Lovasco</u> are clear on this issue). See also, <u>United States v. Hoo</u>, 825 F.2d 667 (2nd Cir. 1987) <u>cert</u> <u>denied</u>, 484 U.S. 1035 (1988)(dissent by Justice White from denial of certiorari acknowledging split). Here, even assuming petitioner could establish the first prong, no facts support a conclusion that the delay was intentionally done by the government. Petitioner does not allege any intentional delay. As far as the state was concerned, the case was closed. It was not until the complainant became aware of similar charges against petitioner in Florida that the prosecution was brought. The renewal of the investigation resulted from petitioner's own new criminal charges and complainant's knowledge of the same. These reasons are not appropriate to form a basis for granting the writ. Thus, there is no showing of a violation of due process or right to a speedy trial such as would violate the federal constitution and the petition should be denied on this ground.

*Right to Travel*

The Court of Appeals also considered the constitutionality of the tolling provision, as against petitioner's claim that it infringed on his right to travel. Petitioner alleged that the tolling provision impermissibly infringed on his constitutional right to travel. The court found that the tolling provision applies only where <u>residency</u> is established in another state and, therefore, is tailored so that it does not unreasonably infringe upon a defendant's right to travel. Further, [the court believed] that the tolling provision advanced a compelling state interest in permitting later prosecutions in cases where a defendant no longer resides in the jurisdiction. <u>Dunn v. Blumstein</u>, 405 U.S. 330 (1972).

Dunn v. Blumstein, 405 U.S. 330 (1972) was an action challenging the state durational residence laws for voter qualification. The Court held that the state law requiring a would-be voter to have been a resident of the state for one year and a resident of the county for three months did not further any compelling state interest and violated the Equal Protection clause of the Fourteenth Amendment. Thus, petitioner would ask the court to extrapolate from that decision to find that indeed, to treat residents differently from non-residents for determining when criminal charges can be brought violates the Equal Protection clause. If so, the state court's determination is both "contrary to" clearly established federal law and an "unreasonable application" of clearly established law because it correctly identifies the legal rule from a Supreme Court case but unreasonably applies that rule to the facts of the particular case and unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. Williams v. Taylor, 529 U.S. 362, 405-7.

The difficulty with this argument lies in both the facts and the law. On the facts, petitioner moved to Florida, got a job, lived there for several years, and was not denied a right to travel, even traveling back and forth to Michigan. In addition, legally, petitioner cites no federal precedent to support his claim. The federal precedent appears to clearly reject his claim. The Supreme Court considered a similar argument in Jones v. Helms, 452 U.S. 412, 420-422 (1981). There, the individual committed a crime in Georgia and then left Georgia and entered another state. The court found that there was no constitutionally protected right to travel in interstate commerce that could be asserted to bar prosecution for the Georgia offense. "We are aware of nothing in our prior cases or in the language of the Federal Constitution that suggests that a person who has committed an offense punishable by imprisonment has an unqualified federal

right to leave the jurisdiction prior to arrest or conviction." Id. at 420. Therefore, habeas relief cannot be granted on this ground.

*Conclusion*

Accordingly, it is recommended that the petition for habeas corpus relief be denied and the case be dismissed with prejudice.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Virginia M. Morgan_____
Virginia M. Morgan
United States Magistrate Judge

Dated: November 19, 2008

-21-

## **PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on November 19, 2008.

s/Jane Johnson
Case Manager to
Magistrate Judge Virginia M. Morgan
